## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Shmeka Gethers, individually and on behalf of all others similarly situated, | Civil Action No. 2:23-cv-00259-MDL |
| *Plaintiffs*, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC.; SOFT SHEEN-CARSON, LLC; SOFT SHEEN/CARSON, INC.; and SOFT SHEEN/CARSON (W.I.), INC., "L'ORÉAL" or "SOFT SHEEN"; STRENGTH OF NATURE GLOBAL, LLC, a/k/a STRENGTH OF NATURE, LLC, and BEAUTY BELL ENTERPRISES, LLC, d/b/a/ HOUSE OF CHEATHAM, INC., | |
| *Defendants*. | |

Plaintiff Shmeka Gethers, ("Ms. Gethers or "Plaintiff"), individually and on behalf of all others similarly situated, respectfully offers the following for her Complaint against L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC.; SOFT SHEEN-CARSON, LLC; SOFT SHEEN/CARSON, INC.; and SOFT SHEEN/CARSON (W.I.), INC., ("L'ORÉAL" or "SOFT SHEEN", STRENGTH OF NATURE GLOBAL, LLC, a/k/a STRENGTH OF NATURE, LLC, and BEAUTY BELL ENTERPRISES, LLC d/b/a/ HOUSE OF CHEATHAM INC, collectively ("Defendants") individually and on behalf of all others similarly situated upon personal knowledge of the facts pertaining to themselves and on information and belief as to all other matters, by through undersigned counsel, hereby bring this Class Action Complaint against Defendants and alleges as follows:

3

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of herself, and all similarly situated consumers ("Class Members") who purchased chemical hair straightening and/or hair relaxers products (the "Products") that were harmful and defective because they contained known endocrine disrupting chemicals that increased the risk of various diseases and illnesses, including cancer, and which were formulated, designed, manufactured, marketed, advertised, distributed, and sold by the Defendants. The Products were purchased and used by Plaintiff and the Class Member. Each of the Products is manufactured, distributed, and sold by the Defendants to consumers across the United States both in retail establishments and online, including in South Carolina where Plaintiff resides. In fact, a subsidiary of Defendant L'Oreal USA, Salon Centric, is the premier distributor and part of the L'Oreal family and has several locations within South Carolina.

2.      This action arises out of 2003 diagnosis of uterine fibroids which was directly and proximately caused by her regular and prolonged exposure to endocrine disrupting chemicals found in the Products.

3.      Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants, their directors, agents, heirs and assigns, and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products.

4.      The Products are defective because each contains the presence of endocrine disrupting chemicals that have known to increase the risk of cancer and other diseases for decades. Yet despite the presence of this knowledge Defendants represented that the Products were safe and effective for their intended use.

5.     Feasible alternative formulations, designs, and materials were available to Defendants at the time the Products were formulated, designed, and manufactured.  Indeed, other manufacturers formulate, produce, and sell non-defective hair straightening products with formulations that do not include endocrine disrupting chemicals that increase the risk of cancer and disease.

6.     Use of such dangerous chemicals in the Defendants' Products is clearly avoidable.

7.     At all relevant times, Defendants did not notify Plaintiff and similarly situated consumers of the Products' increased risk of cancer and disease through its product labels, the ingredients list, other packaging, advertising, or in any other manner, violating state and federal law.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over Defendants because they have substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and because they purposely availed themselves of the laws of the United States and South Carolina, including in this district, and/or has caused its products to be disseminated in this State and district.

10.     Venue in this district is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiff Ms. Gethers resides in this District, a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, Defendants transact business in this District, and has intentionally

availed itself of the laws and markets within this District. Venue is also proper under 18 U.S.C. § 1965 (a) because Defendants transact substantial business in this district.

**PARTIES**

11.    Plaintiff Shemeka Gethers is a resident and citizen of Summerville, South Carolina who purchased and used Defendants' Products within the relevant time period.

12.    Defendant L'ORÉAL USA, INC. is incorporated in Delaware with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York 10017, and process may be served on its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. The Products, including the adulterated Products bought by Plaintiff and members of the proposed class, are available at retail stores throughout South Carolina and the United States.

13.    Defendant L'ORÉAL USA PRODUCTS, INC. is incorporated in Delaware with  its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue,  New York, New York 10001, and process may be served on its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. The Products, including the adulterated Products bought by Plaintiff and members of the proposed class, are available at retail stores throughout South Carolina and the United States.

14.    Defendant SOFT SHEEN-CARSON, LLC, is a limited liability company organized in New York with its principal place of business and headquarters located at 80 State St., Albany, New York 12207, and process may be served on its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. Plaintiffs allege that SOFT SHEENCARSON, LLC's members and sole interested parties are L'ORÉAL U.S.A., a corporation having its headquarters and principal place of business in France; and L'ORÉAL USA, INC., incorporated in Delaware with its principal place of business and headquarters at 575 Fifth Avenue, New York, New York 10017.

15.     Defendant CARSON, INC., d/b/a SOFT SHEEN, is a corporation with its principal place of business and headquarters located at 2870 Peachtree Rd., Suite. 464, Atlanta, Georgia 40405, and process may be served on its registered agent, Justin Hill, 2870 Peachtree Rd., Suite 464, Atlanta, Georgia 40405.

16.     Defendant CARSON (W.I.), INC., d/b/a SOFT SHEEN, is a Delaware corporation and process may be served on its registered agent, Corporate Services Company 251 Little Falls Drive, Wilmington, Delaware 19808.

17.     Defendant STRENGTH OF NATURE GLOBAL, LLC, is, and at all times relevant to this action was, a limited liability company organized in Georgia with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karen Sood, 6355 Peachtree Dunwoody Road, Atlanta, Georgia, 30328. Plaintiff alleges that at all times relevant to this action, Strength of Nature, LLC's sole members and interested parties, Mario M. De La Guardia, Jr., is domiciled in Florida and is a citizen of Florida, having his true, fixed and permanent home and principal establishment in the State of Florida; and Jack Wardlaw is domiciled in Georgia and is a citizen of Georgia having his true, fixed and permanent home and principal establishment in the State of Georgia. This Court has jurisdiction over Strength of Nature, LLC based on complete diversity of citizenship between Plaintiff and each member of Strength of Nature, LLC and Defendants collectively.

18.     Defendant BEAUTY BELL ENTERPRISES, LLC, d/b/a/ HOUSE OF CHEATHAM, INC., is a domestic limited liability company organized in Georgia with its principal office located at  1445 Rock Mountain Blvd., Stone Mountain, Georgia 30883 and process may be served upon

its registered agent, Scroggin & Burns, LLC, 47 Mimosa Blvd., Roswell, Georgia 30075. Plaintiff alleges that, at all times relevant to this action, Beauty Bell Enterprises, LLC d/b/a House of Cheatham's sole members and interested parties, Robert H. Bell is domiciled in Georgia and is a citizen of Georgia, having his true, fixed and permanent home and principal establishment in the State of Georgia; and Jay Studdard is domiciled in Georgia and is a citizen of Georgia, having his true, fixed and permanent home and principal establishment in the State of Georgia. This Court has jurisdiction over Beauty Bell Enterprises, LLC based on complete diversity of citizenship between Plaintiff and each member of Beauty Bell Enterprises, LLC and Defendants collectively. At all pertinent times, all Defendants were engaged in the research, development, manufacture, design, testing, sale, and/or marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products be sold in the State of South Carolina.

19.     Defendant HOUSE OF CHEATHAM, LLC, is a domestic limited liability company organized in Delaware with its principal office located at 1445 Rock Mountain Boulevard, Stone Mountain, Georgia 30883 and process may be served upon its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. Defendant House of Cheatham, LLC is also a foreign limited liability company organized in Georgia with its principal office located at 1445 Rock Mountain Blvd., Stone Mountain, Georgia 30883 and process may be served upon its registered agent, C T Corporation System, 289 South Culver Street, Lawrenceville, Georgia, 30046. Plaintiff alleges, at all times relevant to this action, House of Cheatham, LLC's sole members and interested parties, Robert H. Bell is domiciled in Georgia and is a citizen of Georgia, having his true, fixed and permanent home and principal establishment in the State of Georgia; and Jay Studdard is domiciled in Georgia and is a citizen of Georgia, having his true, fixed and permanent home and principal establishment in the State of Georgia. This court has jurisdiction over House of Cheatham,

LLC based on complete diversity of citizenship between Plaintiff and each member of House of Cheatham, LLC and Defendants collectively.

20.    Plaintiff purchased Defendants' products in the State of South Carolina, and the damages sustained by Plaintiff as alleged herein occurred within the State of South Carolina.

21.    At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products.

22.    Defendants' defective hair products were placed into the stream of interstate commerce and was used by the Plaintiff until approximately 2017.

## FACTUAL BACKGROUND

23.    The Products at issue in this lawsuit are chemical hair straighteners and/or hair relaxers products used by consumers, including Plaintiff and similarly situated consumers, to chemically straighten and/or relax hair.

24.    African-Americans spending on straightening and relaxer products accounts for as much as 22 percent of the $42 billion-a- year personal care products market, suggesting that they buy and use more of such products –with potentially harmful ingredients– than Americans as a whole.[1]

------

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

9

25.    In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) were ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less- hazardous alternatives to personal care products. The worst-scoring products marketed to African American women were hair relaxers.

26.    In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

**The Defendants Marketing Efforts**

27.    In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.

28.    In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking. As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981.[2]

29.    Over time, other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.

30.    Defendants market their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendants' marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard or preferred.

31.    The L'ORÉAL and SOFT SHEEN Defendants depict a Black woman with straight hair on each of their Dark and Lovely and Optimum brands of relaxer product.

---

[2] Cicely A. Richard, This History of Hair Relaxers, September 29, 2017, https://classroom.synonym.com/thehistory-of-hair-relaxers-12078983.html.





32.     Defendant Strength of Nature Global, LLC markets its Soft & Beautiful and Motions relaxer products, depicting beautiful, happy, fair-skinned African American women with straight hair in seeming perpetual motion.





33.     Defendant Strength of Nature Global, LLC's Just for Me brand specifically targets young Black girls with promises of "perfect straightness."



34.     Defendant Beauty Bell Enterprises, LLC d/b/a House of Cheatham, Inc.'s Africa's Best brand depicts beautiful, happy, fair-skinned African American women with straight hair in its products which it markets as using African Herbal Extracts to achieve these looks. Defendant Beauty Bell Enterprises d/b/a House of Cheatham, Inc.'s Africa's Best brand is intentionally labeled as "Herbal" and using "African Herbal Extracts with Extra Virgin Olive Oil" in marketing their products, while also claiming that their product "restores essential moisture, nutrients and vitamins to your hair."



35.     In the 1990s, the first relaxer product for young African American girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[3] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

---

[3] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads*, HuffPost, Feb., 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercialsong_n_4689981.

36.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

**How do the Products Work?**

37.    Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States, including in South Carolina.

38.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

39.    Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The main ingredient of ''lye'' relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate; and ''thio'' relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

40.    Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals

**The Regulatory Framework**

41.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Federal Food Drug and Cosmetic Ace ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

42.    The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

43.    Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling.

44.    Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user and 2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

45.    Misbranding refers to violations involving improperly labeled or deceptively packaged products.

15

46.    Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970[4]

47.    Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[5] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[6]

48.    On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously-authorized phthalates to be used as food additives because these uses have been abandoned by industry.[43] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[7]

49.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

50.    The FDA has consistently advised manufacturers to use whatever testing is

---

[4] Food and Drug Administration Cosmetic Act § 602 (1938).
[5] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[6] 21 Code of Federal Regulations § 700.19.
[7] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food- packaging-and-food-contact-applications.

necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[8]

51.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.

52.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

53.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers anytime a health hazard may be associated with

---

[8] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar.,3, 2005,
https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine- disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

**The Dangers of Chemical Hair Straighteners and/or Relaxers**

54.      The endocrine system is indispensable for life and influences nearly every cell, organ, and processes within the body.[9] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[10]

55.      The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[11]

56.      Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes. When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[12]

---

[9] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system
[10] *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system
[11] *Id*.
[12] *Id*.

57.    The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome. [13]

58.    Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

59.    EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery. [14]

60.    EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

61.    EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

62.    EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

---

[13] *Id*.; Michele La Merrill, et al., Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8

[14] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

63.    EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors. [15]

64.    EDCs are known to cause to numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities. [16]

65.    EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, endogenously and exogenously, is associated with cancer and a woman's lifetime risk of developing the disease increases with greater duration and cumulative exposure.

66.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes", and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

67.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2-ethylhexylphthalate have on the male and female

---

[15] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

[16] *Endocrine    Disrupting    Chemicals    (EDCs)*, Endocrine    Society,    Jan.,    24,    2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, fibrorids, and abnormal puberty onset.[17]

**Phthalates**

68.      Phthalates are used in a variety of cosmetics and personal care products.

69.      Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

70.      Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

71.      At all relevant times herein, phthalates were used in Defendants' products.

72.      Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[18]

73.      Phthalates are well-known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[19]

74.      Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

---

[17] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
[18] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates
[19] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

75.     Phthalates can be found in most products that have contact with plastics during producing, packaging, or delivering. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[20]

76.     Phthalates are a series of chemical substances, which are mainly used as plasticizers added to polyvinyl chloride ("PVC") plastics for softening effects. Phthalates can potentially disrupt the endocrine system.[21]

77.     Defendants' products referenced herein contain phthalates, including but not limited to Di-2- ethylhexylphthalate.

78.     Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

79.     However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients meaning phthalates evade listing when combined with a fragrance. As a result, a consumer, including the Plaintiff were not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

80.     Since 1999, the Centers for Disease Control ("CDC") have found phthalates in individuals studied for chemical exposure.[61]  Neither IARC nor NTP has evaluated DEHP with respect to human carcinogenicity.

---

[20] *Id.*
[21] *Id.*

### Di-2-ethylhexylphthalate

81.    Di-2-ethylhexylphthalate ("DEHP") is a highly toxic manufactured chemical[22] that is not found naturally in the environment.[23]

82.    DEHP belongs to the family of chemicals called phthalates.[24]

83.    DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[25]

84.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure. [26]

85.    Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life. [27]

86.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that

---

[22] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International, Feb., 22, 2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites.

[23] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[24]    *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[25]    Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[26] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science        Direct, May        2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[27] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

the range of daily human exposure to DEHP is 3–30 µg/kg/day. [28]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and
formaldehyde. N.C. = not calculated by OEHHA as of August 2020.

87.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg
bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[29]

88.    When DEHP enters in the human body, it breaks down into specific metabolites. The
toxicity of DEHP is mainly attributed to its unique metabolites which include the primary
metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl- 5-
hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[30]

89.    DEHP and its metabolites are known to cause significant adverse-health effects
including but not limited to: endometriosis, developmental abnormalities, reproductive dysfunction

---

[28] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume90,Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[29] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[30] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1, 16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900- 016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5- cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).

and infertility,[31] various cancers, and metabolic syndrome within the human population and their future children.[32]

90.    Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[33]

91.    The studies suggest potential associations between DEHP exposure and the following health outcomes:

**Reproductive effects.** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

**Developmental effects.** Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

92.    The global consumption of DEHP was estimated at 3.07 million tons (Global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[34]

---

[31] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology*, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[32] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

[33] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf

[34] *Id*.

93.    Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[35]

94.    Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[36]

95.    When it comes to the impacts on children, epidemiological studies about phthalates toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[37]

96.    Since the turn of the century, restrictions on phthalates have been proposed in many countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[38]

**Parabens**

97.    Parabens are used as preservative and antibacterial agents in personal care products, and have estrogenic and anti-androgenic activity. [39]

98.    Hair products used by African American women, including chemical

---

[35] *Id.*

[36] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

[37] *Id.*

[38] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

[39] Harley KG, et al., Reducing phthalate, paraben, and phenol exposure from personal care products in adolescent girls: findings from the HERMOSA Intervention Study. Environ Health Perspect 2016;124:1600–1607; http://dx.doi. org/10.1289/ehp.1510514.

straighteners/relaxers contain parabens, which affect estrogenic pathways. [40]

99.    The prevalence of these compounds in the Defendnats products is consistent with corresponding higher levels found in biomonitoring samples of Black women as compared with White women.  In addition, one study indicated that Black children in the U.S. have five times the urinary paraben levels of White children. [41]

100.    Parabens have been associated with uterine fibroid tumors, premature puberty, and endocrine disruption. [42]

101.    In one study, parabens were found in breast tumor tissue at levels similar to those shown to induce uterine growth in rodents. [43]

**Formaldehyde**

102.    Formaldehyde is a naturally occurring, organic, reactive, volatile, colorless gas detectable in air, drinking water, and foods. [44]

103.    Formaldehyde has been classified as a known human carcinogen by both the U.S. Department of Health and Human Services' National Toxicology Program ("NTP") and IARC. Specifically, in 2005, IARC published its conclusions regarding formaldehyde: "After a thorough discussion of the epidemiologic, experimental, and other relevant data, the working group concluded

---

[40] Zota A.R., et al., The environmental injustice of beauty: framing chemical exposures from beauty products as a health disparities concern. Am. J. Obest. & Gyn. Oct. 2017.
[41] Calafat A.M., et al., *Urinary concentrations of four parabens in the U.S. population: NHANES 2005–2006*.  Environ Health Perspect. 2010;118:679–685. [PubMed: 20056562].
[42] Helm J.S., et al., Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women. Environ. Research 2018;165:448-458.
[43] Myers S.L., et al., *Estrogenic and anti-estrogenic activity of off-the-shelf hair and skin care products*. J. Expo. Sci. Environ. Epidemiol. 2015;25(3):271-277. doi:10.1038/jes.2014.32.
[44] Pierce J.S., et al., *Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products*. J. Occ. and Environ. Hygiene 2011;8:686-699.

that formaldehyde is carcinogenic to humans, based on sufficient evidence in humans and in experimental animals." [45]

104.    Formaldehyde is a common ingredient in the Defendants chemical hair straighteners, even in those labeled as "formaldehyde-free," released into the air when the product is heated during application.[46]

### Injuries Associated with Exposure to EDCs

### Uterine Cancer

105.    Uterine cancer is associated with phthalate metabolites found in hair care products.

106.    Uterine cancer, otherwise known as endometrial carcinoma, is among the more common (the fourth most common) cancers in women in developed countries,[47] accounting for about 3% of all new cancer cases.[48]

107.    Every year around 65,000 females develop uterine cancer in the USA alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the mean age being 61 years.[49]

---

[45] *Id.*
[46] Cogliano V.J., et al., *Meeting Report: Summary of IARC Monographs on Formaldehyde, 2-Butoxyethanol, and 1tert-Butoxy-2Propanol*. Environ. Health Perspect. 2005;113:1205–1208. doi:10.1289/ehp.7542 available via http://dx.doi.org/.
[46] Pierce J.S., et al., Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair
[47] Unaiza Faizan & Vijayadershan Muppidi, *Uterine Cancer*, In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313/
[48] *Cancer Stat Facts: Uterine Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html
[49] *Id.*

108.    However, the incidence in Black women is twice that of White women.[50] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[51]

109.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[52]

110.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same time frame.[53]

111.    A groundbreaking study recently found that women who use chemical hair straightening or relaxing products have a higher risk contracting of uterine cancer.[54]

112.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.[55]

113.    These risks are more substantial among Black women, who make up the overwhelming majority of hair straightening and hair relaxing products, including as Defendants' products.

### Uterine Fibroids

114.    Uterine fibroids are associated with phthalate metabolites found in hair care products.

---

[50] *Id.*
[51] Joel Sorosky, *Endometrial Cancer*, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/
[52] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes With Personalized Care*, American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/
[53] Jack J. Lee, *Rising Endometrial Cancer Rate Spur New Approaches to Prevention*, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer
[54] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/
[55] *Id.*

115.    Black women have a higher prevalence of uterine fibroids and tumors than any other ethnicity/racial group.[127]

116.    A 2012 study in the American Journal of Epidemiology associated fibroid risk with the use of hair relaxers. Shirley McDonald of the Hair and Scalp Clinic says, "We now know that many hair products contain chemicals that are considered carcinogenic and/or hormone disrupters, leading to increased risk of medical issues such as fibroids(non-cancerous tumors that grow in the uterus, potentially damaging fertility and leading to a host of other complications). Trichologists see lots of conditions that are likely to be triggered by hair products, particularly central centrifugal cicatricial alopecia, a type of permanent hair loss to the crown area of the scalp.

117.    More recently, the National Institutes of Health spent eight-years studying over 46,000 women of all races between the ages of 35–74. They were looking for links between chemical hair relaxers and breast cancer. And, they discovered African American women's breast cancer risk increased risk by 45%. Breast cancer and other reproductive issues, including, fibroid development, are often connected. So this study suggests there are even more reasons to steer clear of black hair relaxers. Plus, there's a new study from the American Journal of Epidemiology further confirms this link. In their group of 23,000 menstruating Black American women, these participants displayed two to three times higher uterine fibroid incidences.

118.    Concerns around racial disparities in healthcare linked to chemicals found in cosmetic products are not new; previous studies, as far back as 2012, have also suggested a correlation between chemical relaxer use and uterine fibroids, a condition that disproportionately affects Black women.[56]

---

[56] Nadine White, *Campaign urges beauty firms to pull 'toxic' hair products aimed at Black women*, Independent (August 3, 2021), https://www.independent.co.uk/news/uk/home-news/black-hair-lye-no-more-lyes b1893747.html.

119.    Hair relaxers are used by millions of black women, possibly exposing them to various chemicals through scalp lesions and burns. In the Black Women's Health Study, the authors assessed hair relaxer use in relation to uterine leiomyomata incidence. In 1997, participants reported on hair relaxer use (age at first use, frequency, duration, number of burns, and type of formulation). From 1997 to 2009, 23,580 premenopausal women were followed for incident uterine leiomyomata. The incidence of uterine leiomyomata is 2–3 times higher in US black women than in US white women.

**Endometriosis**

120.    Endometriosis is associated with phthalate metabolites found in hair care products.

121.    In Black women in the USA, endometriosis is one of the common indications for major gynecological surgery and hysterectomy, and is associated with long hospital stay and high hospital charges.[57]

122.    Phthalate metabolites were related to increased uterine volume, a sign of fibroids on ultrasound, 2018.[58] The sum of DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%. [59]

123.    The function of the uterine lining, the endometrium, is based on cell–cell interactions under the instruction of steroid hormones.[60] Endometriosis, a common cause of female infertility,

---

[57] M. C. Kyama, *The prevalence of endometriosis among African-American and African-indigenous women*. Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452/.

[58] Amir R. Zota et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study*, Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/.

[59] *Id.*

[60] L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis*, Human Reproduction, Vol. 18, Issue 7 (2003), 1512–1515, https://doi.org/10.1093/humrep/deg254.

occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced cellular equilibrium. [61]

124.    It is estimated that 20% to 50% of women being treated for infertility have endometriosis.[62]

125.    Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[63]

126.    During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptor α[64], induces growth of the endometrium.[65]

127.    The developing fetus and the female reproductive tract are particularly susceptible to EDCs.[66] EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling.[67] Specifically, DEHP is known to cause enhanced-estrogenic activity.[68]

---

[61] D. L. Olive and L. B. Schwartz, *Endometriosis*, The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K. G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to development of endometriosis?*, Seminars in Reproductive Endocrinology, Vol. 15(3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/9383839/.

[62] *Endometriosis*, World Health Organization (March 31, 2021), https://www.who.int/news- room/fact-sheets/detail/endometriosis.

[63] *Id*.

[64] Iaria Paterni et al., *Estrogen receptors alpha (ERα) and beta (ERβ): subtype-selective ligands and clinical potential*, Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/.

[65] Kun Yu et al., *Estrogen Receptor Function: Impact on the Human Endometrium*, Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35295981/.

[66] Saniya Rattan et al., *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice*, Toxicol Sci., Vol. 163(2) (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5974785/.

[67] Xueping Chen et al., *Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures*, Int'l J. Envtl. Res. and Pub. Health, 1(3):3156-3168 (2014) https://doi.org/10.3390/ijerph110303156; Pablo A, Pérez et al., *The phthalate DEHP modulates the estrogen receptors α and β increasing lactotroph cell population in female pituitary glands*, Chemosphere, Vol. 258:127304 (2020), https://pubmed.ncbi.nlm.nih.gov/32559490/.

[68] Chon-Kit Chou et al., *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes*, Envtl. Toxicology, Vol. 3, Issue 4 (2019),

128.    DEHP is a known estrogen receptor agonist that promotes cell proliferation.[69] An agonist is a chemical that activates a receptor to produce a biological response.

129.    Numerous studies, spanning over decades, establish that DEHP leads to the development of endometriosis as it is known to increase the viability, activity, proliferation, migration of endometrial stromal cells, a required precondition of endometriosis.[70]

130.    Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[71] A study that included a sample size of approximately 500 women living in various states observed that DEHP's metabolite, MEHP, a was the only phthalate consistently associated with endometriosis.[72]

### Plaintiff's Use of Hair Relaxing Products

131.    Ms. Gethers was first exposed to EDCs and/or phthalate-based products around 18 years old when she began using Defendants' Products.

---

[69] Juhye Kim, et al., *Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus*, Development & reproduction, Vol. 22(4):379-391 (2018), https://pubmed.ncbi.nlm.nih.gov/30680337/. ("In the present study, we could see that in vitro treatment with DEHP caused various biological changes of endometrial cells such as increased MMP-2 and -9 activities, increased cell invasion, increased Erk phosphorylation, and increased Pak4 expression. Taken these findings together with our previous in vitro study, we can propose that refluxed endometrial cells could not only survive in the pelvic cavity following retrograde menstruation, but also invade through mesothelial layer, develop vascular supplies, proliferate at ectopic location, and eventually establish endometriotic lesions through various biological alterations caused by exposure to high level of phthalate.")

[70] *Id.*

[71] L. Cobellis et. al, *High plasma concentrations of di-(2-ethylhexyl)-phthalate in women with endometriosis*, Human Reproduction, Vol. 18, Issue 7 (July 1, 2013), 1512–1515, https://doi.org/10.1093/humrep/deg254. Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and /or its metabolite, MEHP.

[72] Buck Louis G. M. et al., *Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study*, Fertility and sterility, Vol. 100(1):162-9.e1-2 (2013), https://pubmed.ncbi.nlm.nih.gov/23579005/.

132.    Ms. Gethers used Defendants' Products by applying this to her scalp or by having a professional at a hair salon apply Defendants' Products exactly as instructed by Defendants.

133.    Ms. Gethers continued using the Defendants Products until 2017.

134.    Ms. Gethers would keep the Defendants Products on her hair for the time allotted in the instructions.

135.    There was never any indication, on the Products packaging or otherwise, that this normal use could and would cause her to develop uterine fibroids.

136.    Ms. Gethers was diagnosed with uterine firborids. Her doctors conducted a DNC procedure and prescribed her medicine.

137.    In 2004 Ms. Gethers underwent a myomectomy to remove the fibroids.

138.    In 2008 Ms. Gethers required a hysterectomy because she had a tubal pregnancy due to the fibroids.

139.    Due to the above, Ms. Gethers was never able to have children.

140.    As a result of Defendants' acts and/or omissions, Ms. Gethers suffered extreme pain and suffering, and extreme emotional distress.

## CLASS ACTION ALLEGATIONS

141.    Plaintiff brings this case as a class action pursuant to Federal Rule of Civil Procedure 23 on her own behalf and as the Class Representative of the following:

**Nationwide Class**: All persons within the United States who purchased and used the Products within the applicable statute of limitations and were diagnosed with Uterine Cancer, Endometriosis, or Uterine Fibroids.

**South Carolina Subclass:** All persons within South Carolina who purchased and used the Products within the applicable statute of limitations and were diagnosed with Uterine Cancer, Endometriosis, or Uterine Fibroids.

142.    The Nationwide Class and South Carolina Subclass shall collectively be referred to herein as the "Classes."

143.    Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

144.    Excluded from the Classes are governmental entities, Defendants, its officers, directors, affiliates, legal representatives, and employees.

145.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

146.    **Numerosity** – Federal Rule of Civil Procedure 23(a)(1). Plaintiffs are informed and believes that the proposed Classes contain thousands of purchasers of Defendants' toxic Hair Straightener and/or Hair Relaxers. As a result, joinder of all Class members in a single action is impracticable. Class members may be informed of the pendency of this class action through a variety of means, including, but not limited to, direct mail, email, published notice, and website posting.

147.    **Existence and Predominance of Common Questions of Law and Fact** – Federal Rule of Civil Procedure 23 (a)(2) and 23(b)(3). There are questions of fact and law common to the Classes that predominate over any question affecting only individual members. Those questions, each of which may also be certified under Rule 23(c)(4), include without limitation:

a. whether Defendants' advertising, merchandising, and promotional materials directed to Plaintiff were deceptive regarding the increased risk of cancer posed by chemicals in Defendants' Products;

b. whether Defendants made representations about the safety of the Products;

c. whether Defendants omitted material information related to the safety of the Products;

d. whether Defendants' Products were merchantable;

e. whether Defendants violated the consumer protection statutes invoked herein;

f.   whether Defendants' conduct alleged herein was fraudulent; and

g.   whether Defendants were unjustly enriched by sales of the Products.

148.    The questions set forth above predominate over any questions affecting only individual persons concerning sales of Defendants' Products throughout the United States and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of Plaintiff's claims.

149.    **Typicality** – Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of those of the Class in that the Class members uniformly purchased Defendants' Products and were subjected to Defendants' uniform merchandising materials and representations at the time of purchase.

150.    **Superiority** – Federal Rule of Civil Procedure 23(b)(3). A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class members could create a risk of inconsistent adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of Class members to protect their interests. In addition, it would be impracticable and undesirable for each member of the Class who suffered an economic loss to bring a separate action. The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members.

151.    **Adequacy** – Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Classes because she is a member of the Classes and her interests do not conflict with the interests of the Classes that she seeks to represent. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her undersigned counsel. Counsel is

experienced in the litigation of civil matters, including the prosecution of consumer protection class action cases.

152. **Insufficiency of Separate Actions** – Federal Rule of Civil Procedure 23(b)(1). Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

153. **Declaratory and Injunctive Relief –** Federal Rule of Civil Procedure 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiff seeks to certify a Class to enjoin Defendants from selling or otherwise distributing the Products as labeled until such time that Defendants can demonstrate to the Court's satisfaction that the Products confer the advertised benefits and are otherwise safe to use as intended.

154. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

b. The prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## CAUSES OF ACTION

155. All Counts are alleged on behalf of the Plaintiff, the National Class, and the South Carolina Subclass.

### COUNT I- Breach of Express Warranty

156. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

157. Plaintiff, and each member of the National Class and the Subclass, formed a contract with Defendants at the time Plaintiff and each member of the National Class and the Subclass purchased the Products. The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above.

158. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and the members of the National Class and the Subclass and Defendants.

159. As set forth above, Defendants purport through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use.

160. Plaintiff and the members of the National Class and the Subclass performed all conditions precedent to Defendants' liability under this contract when they purchased the Products

161. Defendants breached express warranties about the Products and their qualities because Defendants' Products contained chemicals that increase the risk of cancer at the time of purchase and the Products do not conform to Defendants' affirmations and promises described above.

162. Plaintiff and each of the members of the National Class and the Subclass would not have purchased the Products had they known the true nature of the harmful chemicals in the Product.

163.    As a result of Defendants' breach of warranty, Plaintiff and each Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT II- Breach of Implied Warranty**

164.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

165.    Defendants are merchants and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

166.    The Products are "goods" under the relevant laws, and Defendants knew or had reason to know of the specific use for which the Products, as goods, were purchased.

167.    Defendants entered into agreements with retailers to sell its Products to be used by Plaintiff and Class Members for personal use.

168.    The implied warranty of merchantability included with the sale of each Product means that Defendants guaranteed that the Products would be fit for the ordinary purposes for which Hair Straighteners and/or Hair Relaxers products are used and sold, and were not otherwise injurious to consumers. The implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendants, and Plaintiff and the Class Members.

169.    Defendants breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose of providing reasonably reliable and safe use for Hair Straighteners and/or Hair Relaxers because the Products contain chemicals that increase the risk of cancer. Thus, the Products are not fit for their particular purpose of safely Hair Straighteners and/or Hair Relaxers.

170.    Defendants' warranty expressly applies to the purchaser of the Products, creating privity between Defendants and Plaintiff and Class Members. Yet privity is not required because Plaintiff and Class Members are the intended beneficiaries of Defendants' warranties and its sale

through retailers. Defendants' retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. Defendants' warranties were designed for and intended to benefit the consumer only, including Plaintiff and Class Members.

171.    Defendants have been provided sufficient notice of its breaches of implied warranties associated with the Products. Defendants were put on constructive notice of its breach through its review of consumer complaints and other reports, including the National Institute of Health testing report discussed throughout this complaint, and upon information and belief through its own product testing.

172.    Had Plaintiff, Class Members, and the consuming public known that the Products were contaminated with chemicals that increase the risk of cancer, they would not have purchased the Products.

173.    As a direct and proximate result of the foregoing, Plaintiff and Class Members suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT III- Negligent Misrepresentation

174.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

175.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the Subclass.

176.    Defendants specifically made false representations about the Product's safety to the Plaintiff and members of the proposed Classes through their websites, social media accounts, and other advertisements.

177.    Thus, Defendants deceptively marketed its Products to Plaintiff and members of the proposed class that its Products would safely chemically straighten and/or relax hair without containing chemicals that increase the risk of cancer and other diseases.

178.    Defendants have a pecuniary interest in making these advertisements as it was made in the course of Defendants' course of business.

179.    Defendants breached its duty by falsely advertising and marketing that its Products would safely chemically straighten and/or relax hair without containing chemicals that increase the risk of cancer and other diseases.

180.    Plaintiff and members of the Class reasonably and justifiably relied on Defendants' advertisements and promotions as Defendants were in a superior position to know the truth of the advertisements and promotions made.

181.    Plaintiff and members of the Class were reasonable to rely on the Defendants' advertisements and promotions as true because Plaintiff and member of the Class did not know the truth of the statements nor could ascertain the truth.

182.    Defendants' conduct is the direct and proximate cause of the pecuniary loss suffered by Plaintiff and Class members.

183.    Plaintiff and the National Class, and the South Carolina Subclass seek actual damages, injunctive and declaratory relief, attorney's fees, costs, and any other just and proper relief available.

**COUNT IV -Fraudulent Concealment**

184.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

185.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class, and the South Carolina state subclass.

186.    Defendants had a duty to disclose material facts to Plaintiff and the Classes given their relationship as contracting parties and intended users of the Products. Defendants also had a duty to

41

disclose material facts to Plaintiff and the Classes—that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendants had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

187.    Defendants possessed knowledge of these material facts. Defendants have been aware of the positive association between DEHP used in their products and an increased risk of cancer and diseases demonstrated by epidemiology studies that exposure to the phthalates in their products enhance invasive and proliferative activities of endometrial cells.

188.    Studies have established a statistically significant correlation between Defendants' Products and cancer, among other diseases.

189.    During this time, Plaintiff, and members of the Classes, were using the Products without knowing they contained chemicals that increase the risk of cancer.

190.    Defendants failed to discharge its duty to disclose these materials facts. In so failing to disclose these material facts to Plaintiff and the Classes, Defendants intended to hide from Plaintiff and the Classes that they were purchasing and consuming the Products with harmful defects that was unfit for human use, and thus acted with scienter and/or an intent to defraud.

191.    Plaintiff and the Classes reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendants had they known they contained chemicals that increased the risk of cancer.

192.    As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiff, and the Classes, suffered damages in the amount of monies paid for the defective Products.

193.    As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

## COUNT V -Unjust Enrichment

194.    Plaintiff incorporates the allegations set forth in the preceding paragraphs as though set forth fully herein.

195.    Plaintiff, and the other members of the Nationwide Class and Subclass, conferred benefits on Defendants in the form of monies paid to purchase Defendants' defective and worthless Products.

196.    Defendants voluntarily accepted and retained this benefit.

197.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendants to retain the benefit without paying the value thereof.

198.    Defendants received benefits in the form of revenues from purchases of the Products to the detriment of Plaintiff, and the other members of the Classes, because Plaintiff, and members of the Classes, purchased mislabeled products that were not what they bargained for and were not safe and effective, as claimed.

199.    Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other members of the Classes. Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Products was misleading to consumers, which caused injuries to Plaintiff, and members of the Class, because they would have not purchased the Products had they known the facts.

200.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and members of the Class for its unjust enrichment, as ordered by the Court.

## COUNT VI -Breach of Implied Warranty of Merchantability

201.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

202.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the South Carolina State subclass.

203.    Defendants are merchants engaging in the sale of goods to Plaintiff and the Classes.

204.    There was a sale of goods from Defendants to Plaintiff and the Class members.

205.    As the developer, manufacturer, marketer, distributor, and/or seller of the defective Products, Defendants impliedly warranted to Plaintiff and the Classes that its Products were fit for their intended purpose in that they would be safe for Plaintiff and the Classes to use for Hair Straighteners and/or Hair Relaxers.

206.    Contrary to these representations and warranties, the Products were not fit for their ordinary use, and did not conform to Defendants' affirmations of fact and promises as use of the Products was accompanied by the risk of adverse health effects that do not conform to the packaging.

207.    Defendants breached the implied warranty in the contract for the sale of the Products by knowingly selling to Plaintiff and the Classes a product that Defendants knew, or should have known, would expose Plaintiff and the Classes to significant health risks, thus meaning Defendants knew that the Products were not fit for their intended purpose.

208.    Defendants were on notice of this breach, as they were made aware of the adverse health effects accompanying use of their Products years prior.

209.    Plaintiff and the Class members did not receive the goods as bargained for because the goods they received were not merchantable as they did not conform to the ordinary standards for goods of the same average grade, quality, and value.

210.    Plaintiff and members of the Classes are the intended beneficiaries of Defendants' implied warranties.

211.    The Products were not altered by Plaintiff or the members of the Classes.

212.    Plaintiff and members of the Classes used the Products in the ordinary manner in which such devices were intended to be used.

213.    The Products were defective when they left the exclusive control of Defendants.

214.    The Products were defectively designed and/or manufactured and unfit for their intended purpose, and Plaintiff and members of the Classes did not receive the goods that they bargained for.

215.    Plaintiff and members of the Classes purchased the Products that contained the Defect, which was undiscoverable by them at the time of purchase and at any time during the class period.

216.    As a result of the defect in the Products, Plaintiff and members of the Classes have suffered damages including, but not limited to, the cost of the defective device, loss of use of the device and other related damage.

217.    Defendants breached the implied warranty of merchantability to the Plaintiff and Class members.

218.    Thus, Defendants' attempt to limit or disclaim the implied warranties in a manner that would exclude coverage of the Defect is unenforceable and void.

219.    Plaintiff and Class members have been damaged by Defendants' breach of the implied warranties.

220.    Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

## COUNT VII -Negligence

221.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

222.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the South Carolina State subclass.

223.    Defendants, directly or indirectly, caused the Products to be sold, distributed, marketed, promoted, and/or used by Plaintiff and the Class members.

224.    At all times relevant to this litigation, Defendants owed a duty to Plaintiffs and the proposed Class members to exercise reasonable care in its designing, marketing, supplying, packaging, promoting, and selling Defendants' products, including the duty to prevent the Products from containing chemicals that increase the risk of cancer in the Defendants' products.

225.    Defendants also owe a duty to Plaintiffs and the Class members to manufacture, distribute, and sell Hair Straighteners and/or Hair Relaxers products that are safe and fit for human consumption, meaning without chemicals that increase the risk of cancer.

226.    Plaintiffs and all Class members are reasonable consumers who expect companies, like Defendants, to manufacture, distribute, and sell Hair Straighteners and/or Hair Relaxers products that are safe and fit for human usage.

227.    At all relevant times to this litigation, Defendants knew, or in the exercise of reasonable care, should have known that Plaintiffs and Class Members purchased Defendants products for Hair Straighteners and/or Hair Relaxers.

228.    Defendants breached its duty to design, manufacture, distribute, and sell Hair Straighteners and/or Hair Relaxers products that are safe and fit for human usage when it manufactured, distributed, and sold its products containing chemicals that increase the risk of cancer.

229.    Despite the ability and means of the Defendants to design, manufacture, distribute, and sell Hair Straighteners and/or Hair Relaxers products without chemicals that increase the risk of cancer and other diseases, Defendants failed to do so. Indeed, Defendants wrongfully produced, manufactured, distributed, and sold Hair Straighteners and/or Hair Relaxers products that were unsafe and unfit for human usage.

230.    Defendants' negligence included but is not limited to:

   a.  Selling and/or distributing Hair Straighteners and/or Hair Relaxers products containing chemicals that increase the risk of cancer;

   b.  Selling and/or distributing Hair Straighteners and/or Hair Relaxers products while negligently and/or intentionally concealing increased risk of cancer from the chemicals in Defendants' products;

   c.  Failing to promptly notify Plaintiffs and Class Members of the increased risk of cancer from the chemicals in Defendants' products; and

   d.  Systematically failing to promptly notify the consuming public of the increased risk of cancer from the chemicals in Defendants' Hair Straighteners and/or Hair Relaxers products.

   e.  As a direct and proximate result of Defendants' breach of duty by manufacturing, distributing, and selling Hair Straighteners and/or Hair Relaxers products that contain chemicals that increase the risk of cancer, Plaintiffs and all Class Members have suffered, and will continue to suffer, economic loss. Plaintiffs and all Class Members had purchased Defendants' products to use for Hair Straightening and/or Hair Relaxing and cannot do so as a direct result of Defendants' negligence.

   f.  Plaintiffs' and Class Members' injuries were foreseeable to Defendants because Defendants have been aware of the positive association between DEHP used in their products and an increased risk of cancer demonstrated by epidemiology studies since at least 2015 that exposure to the phthalates in their products enhance invasive and proliferative activities of endometrial cells.

   g.  Plaintiffs and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

**COUNT VIII -Strict Liability – Failure to Warn**

231.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

232.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class, and the South Carolina State subclass.

233.    Defendants had a duty to warn Plaintiff and the Class members regarding the Defect and the true risks associated with the Products

234.    Defendants were in a superior position to know of the Defect.

235.    At all pertinent times, Plaintiff used the Products on her scalp area, which is a reasonably foreseeable use.

236.    At all pertinent times, including the time of sale and consumption, the Products, when put to the aforementioned reasonably foreseeable use, were in an unreasonably dangerous and defective condition  Defendants failed to provide adequate warnings regarding the risks of the Products.

237.    Defendants had information related to the true risks but failed to warn Plaintiff and members of the Classes to strengthen their warnings. At all pertinent times, Defendants in this action knew or should have known that the use phthalates and other EDC's in hair products significantly increases the risk of cancer, including, but not limited to, breast and uterine cancer, based upon scientific knowledge dating back for decades.

238.    Despite their knowledge of the Defect and obligation to strengthen the warnings, Defendants instead chose to actively conceal this knowledge from the public.

239.    Had Plaintiff received adequate warnings that the use of the Products would significantly increase her risk of developing uterine cancer or other diseases , she would not have

used them. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the Products, Plaintiff was injured catastrophically, and was caused severe pain, suffering, infertility, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

240.    This Defect proximately caused Plaintiff's and Class members' damages which were the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Plaintiff suffered injuries and damages including, but not limited to, physical and mental pain and suffering, infertility and medical expenses.

241.    Defendants' products were defective because they failed to contain warnings and/or instructions, and breached express warranties and/or failed to conform to express factual representations upon which Plaintiff justifiably relied in electing to use the Products. The defect or defects made the Products unreasonably dangerous to persons, such as Plaintiff, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of Plaintiff's injuries and damages.

242.    The Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

**COUNT IX -Strict Liability – Design and/or Manufacturing Defect**

243.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

244.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the State subclass.

245.    Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

246.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

247.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which it was manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

248.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

249.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her of developing uterine cancer.

250.    The propensity of phthalates and other endocrine receptive chemicals to trigger cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

251.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any serious disease. Further, safer alternatives, including fragrance free products, have been readily available for decades.

252.    Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in

conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

253.    As a direct and proximate result of Defendants' conduct, including actions, omissions, and misrepresentations, The Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law

## COUNT X -Negligent Failure to Warn

254.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

255.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the South Carolina subclass.

256.    Defendants owed Plaintiff and Class members a duty of care and to warn of any risks associated with the Products.

257.    Defendants' breach of duty caused Plaintiff and Class members economic damages and injuries in the form of exposure to chemicals that increase the risk of cancer.

258.    Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law

## COUNT XI -Negligent Design Defect

259.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

260.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the South Carolina State subclass.

261.    Defendants owed Plaintiff and the Classes a duty to design the Products in a reasonable manner.

262.    The design of the Products was defective and unreasonably dangerous, causing exposure to chemicals with toxic and carcinogenic effects.

263.    The design of the Products caused them to be not fit, suitable, or safe for their intended purpose. The dangers of the Products outweighed the benefits and rendered the products unreasonably dangerous.

264.    There are other Hair Straighteners and/or Hair Relaxers products that do not use these chemicals that increase the risk of cancer and other diseases.

265.    The risk/benefit profile of the Products was unreasonable, and the Products should have had stronger and clearer warnings or should not have been sold in the market.

266.    The Products did not perform as an ordinary consumer would expect.

267.    The Defendants' negligent design of the Products was the proximate cause of damages to the Plaintiff and the Class members.

268.    Plaintiff and Class members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law

**COUNT XII -Violation of the Magnuson-Moss Act, 15 U.S.C. § 2301**

269.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

270.    Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class, and, alternatively, the State subclass.

271.    The Magnuson-Moss Act contains, in pertinent part, the following definitions:

(1) The term "consumer product" means any tangible personal property which is distribute in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).

(3) The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

(4) The term "supplier" means any person engaged in the business of making a consumer product directly or indirectly available to consumers.

(5) The term "warrantor" means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty.

(7) The term "implied warranty" means an implied warranty arising under State law (as modified by sections 2308 and 2304(a) of this title) in connection with the sale by a supplier of a consumer product.

15 .S.C.A. § 2301.

272.    Plaintiff and members of the Classes are "consumers". 15 U.S.C. § 2301(3).

273.    Defendants are a "supplier" and "warrantor." 15 U.S.C. § 2301(4) and (5).

274.    This is a claim arising out of state law, per 15 U.S.C. § 2301 (7).

275.    Defendants impliedly warranted that the Products would be free of defects at the time of delivery, and the Products carried an implied warranty of merchantability.

276.    Defendants breached its warranties by offering for sale and selling the Products that were by design and construction defective and unsafe, thereby subjecting Class members who purchased the Products to damages and risks of loss and injury.

277.    Defendants have breached and continues to breach its written and implied warranties of safety, thereby damaging Plaintiff and the Classes, when their Products fail to perform as represented due to an undisclosed Defect.

278.    As a result of Defendants' continued breach of its warranties, Plaintiff and Class members have suffered damages.

279.     Plaintiff and the Classes seek full compensatory and consequential damages allowable by law, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful acts and practices, restitution, attorney's fees and costs, and any other relief to which Plaintiff and the Classes may be entitled.

**COUNT XIII -Punitive Damages**

280.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

281.     Plaintiff brings this claim against Defendants, on behalf of herself and the other members of the Nationwide Class and the South Carolina State subclass.

282.     Defendants knew or should have known that the chemically straightening and/or hair relaxing products contained chemicals that increase the risk of cancer and thereby unfit for human usage.

283.     Defendants failed to disclose these facts to the consuming public, including Plaintiffs and Class Members.

284.     Defendants risked the safety of recipients of its products, including Plaintiffs and proposed Class members, when Defendant knew increased risk of cancer from the chemicals in the Defendants' Hair Straighteners and/or Hair Relaxers products and suppressed this knowledge from the general consuming public, including Plaintiffs and Class Members.

285.     Defendants made the conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of its harmful Hair Straighteners and/or Hair Relaxers products, despite knowing that the product was defective.

286.     Defendants knew or should have known that this conduct would result in injury or damage.

287.     Defendants' intentional, reckless, fraudulent, and malicious failure to disclose information about the health and safety risks of using the Hair Straighteners and/or Hair Relaxers products deprived Plaintiffs and Class Members the necessary information to enable them to weigh the true risks of using Defendants' products against their benefits.

288.     Defendants acted with wanton and reckless conscious indifference and utter disregard of the consequences of their actions upon the health, safety and rights of others, including Plaintiffs and proposed Class members.

289.     As a direct and proximate result of Defendants' conscious and deliberate disregard for the rights and safety of consumers such as Plaintiffs and proposed Class members, Plaintiffs and proposed Class members have suffered severe and permanent economic injuries as set forth above. Defendants' outrageous conduct warrants an award of punitive damages.

290.     The above conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

### COUNT XIV- Violation of the Adulterated or Misbranded Food and Cosmetics Act § 39-25-10)

291.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

292.     South Carolina's Adulterated or Misbranded Food and Cosmetics Act, § 39-25-10 et seq. (which was adopted under the Federal Act, 21 U.S. Code § 361 and § 362) applies to "cosmetics", which are defined as articles intended to be rubbed on or otherwise applied to the human body or any part thereof for "beautifying, promoting attractiveness or altering the appearance." The Hair Relaxer products fall within the definition of "cosmetic" under the above statute since it is a produce to be

applied onto parts of the body for beautifying, promoting attractiveness or altering the appearance of the hair.

293.    Pursuant to S.C. Code § 39-25-140(a) "[a] cosmetic shall deemed to be adulterated … if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling or advertising thereof, or under such conditions of use as are customary or usual."

294.    Pursuant to S.C. Code § 39-25-150(c), "a cosmetic shall be deemed to be misbranded if any word, statement, or other information required to appear on the label is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."

295.    Hair Relaxer Products are considered to be an adulterated cosmetic under § 39-25-140 because it contains substances that render it injurious to others under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or unusual.

296.    The Defendants failed to properly label its hair relaxers pursuant to S.C. Code § 32-25-10 et seq. since its warnings of the injurious nature of the product were not prominently placed thereon with conspicuousness and with terms likely to be read and understood by the ordinary individual, such as the Plaintiff and the Class members, under customary conditions of purchase and use.

297.    All of the above-listed particulars were the direct, proximate and/or contributing cause of the injuries and damages suffered by the Plaintiff stated herein, as acts being in violation of the statutes and laws of the State of South Carolina.

**COUNT XV-Violation of the Federal Food, Drug, and Cosmetic Act , DRUG, (§§ 301 - 399d)**

298.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

299.    "Cosmetics", which are defined as articles intended to be rubbed on or otherwise applied to the human body or any part thereof for "beautifying, promoting attractiveness or altering the appearance." The Hair Relaxer products fall within the definition of "cosmetic" under the above statute since it is a produce to be applied onto parts of the body for beautifying, promoting attractiveness or altering the appearance of the hair.

300.    Pursuant to §361 "[a] cosmetic shall deemed to be adulterated … if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling or advertising thereof, or under such conditions of use as are customary or usual."

301.    Pursuant to §362 a cosmetic shall be deemed to be misbranded if any word, statement, or other information required to appear on the label is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

302.    Hair Relaxer Products are considered to be an adulterated cosmetic under Federal Food, Drug, and Cosmetic Act , DRUG, (§§ 301 - 399d)  because they contains substances that render it injurious to others under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or unusual.

303.    The Defendants failed to properly label its hair relaxers pursuant to Federal Food, Drug, and Cosmetic Act , DRUG, (§§ 301 - 399d)  since its warnings of the injurious nature of the

product were not prominently placed thereon with conspicuousness and with terms likely to be read and understood by the ordinary individual, such as the Plaintiff and the Class members, under customary conditions of purchase and use.

304.    All of the above-listed particulars were the direct, proximate and/or contributing cause of the injuries and damages suffered by the Plaintiff stated herein, as acts being in violation of the statutes and laws.

### COUNT XVI - Violations of South Carolina Unfair Trade Practices Act

305.    Plaintiff incorporate by reference all preceding allegations as though fully set forth herein.

306.    The South Carolina Unfair Trade Practice Act ("SCUTPA") renders illegal any unfair or deceptive act or practice in trade or commerce affecting South Carolina.

307.    In violation of S.C. Code Ann. § 39-5-10 et seq., Defendants have engaged in unfair methods of competition, and have committed unfair and deceptive acts in trade or commerce that directly and/or indirectly affect the people of the State of South Carolina, and which are injurious to Plaintiff and the Class members and are capable of repetition.

308.    Defendants' unfair methods of competition include, but are not limited to:

a.   Failing to disclose the known injuries the Products caused; and

b.   Representing the Products were safe when the Defendants knew they were not;

309.    Defendants' deceptive and unfair acts affect the public interest, have the potential for repetition, and/or have been repeated in trade or commerce, including in the State of South Carolina.

310.    Defendants' deceptive and unfair acts constitute a willful and/or knowing violation of the laws.

311.    As a direct and proximate cause of the unfair and deceptive acts and practices taken by Defendants, Plaintiff and Class Members have suffered reputational, financial, and other harm.

312.     Plaintiff and Class members seek all damages and other such recoveries available under the law from a party intentionally committing unfair trade practices, including, but not limited to, statutory treble damages and attorney fees pursuant to S.C. Code Ann. §39-5-140.

### REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, other members of the Classes alleged herein, respectfully requests that the Court enter an Order:

    a.   certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

    b.   appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

    c.   finding that the Defendants engaged in the unlawful conduct as alleged herein;

    d.   awarding Plaintiff and the other Class members damages;

    e.   awarding Plaintiff and the other Class members declaratory and injunctive relief;

    f.   awarding Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses; and

    g.   granting such other relief as the Court deems just and appropriate.

And for such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all claims in this Complaint and of any and all issues in this action so triable as of right.

### [SIGNATURE BLOCK ON FOLLOWING PAGE]

59

Respectfully Submitted,


**BELL LEGAL GROUP, LLC**

<u>*s/ J. Edward Bell, III*</u>
J. Edward Bell, III (Bar # 1280)
Aaron Jophlin (Bar #10114)
Gabrielle A. Sulpizio (Bar # 12715)
Bell Legal Group
219 Ridge Street
Georgetown, SC 29440
(843) 546-2408
jeb@belllegalgroup.com
ajophlin@belllegalgroup.com
gsulpizio@belllegalgroup.com

Danielle Ward Mason, (6763L75M) (Pro Hac
forthcoming)
BULLOCK WARD MASON LLC
4915 N. Main Street #426
Acworth, GA  30101
danielle@bwmlaw.com
(833) BWM-LAW1 (main)
(770) 202-4603 (direct)


January 18, 2023